**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 5, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

THE PIONEER CENTRES HOLDING
COMPANY EMPLOYEE STOCK
OWNERSHIP PLAN AND TRUST AND
ITS TRUSTEES, Matthew Brewer, Robert
Jensen, and Susan Dukes,

     Plaintiffs - Appellants,

v.

ALERUS FINANCIAL, N.A.,

     Defendant - Appellee.

No. 15-1227

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:12-CV-02547-RM-MEH)**
_____

Bruce E. Rohde, Campbell Killin Brittan & Ray, LLC, Denver, Colorado, for Plaintiffs -
Appellants.

Shannon Wells Stevenson (Michael T. Kotlarczyk with her on the briefs), Davis
Graham & Stubbs LLP, Denver, Colorado, for Defendant - Appellee.
_____

Before **BACHARACH**, **PHILLIPS**, and **McHUGH**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

# I. INTRODUCTION

The Pioneer Centres Holding Company Employee Stock Ownership Plan and Trust (the "Plan" or "ESOP") and its trustees sued Alerus Financial, N.A. (Alerus) for breach of fiduciary duty in connection with the failure of a proposed employee stock purchase. The district court granted summary judgment to Alerus after determining the evidence of causation did not rise above speculation. The Plan appeals, claiming the district court erred in placing the burden to prove causation on the Plan rather than shifting the burden to Alerus to disprove causation once the Plan made out its prima facie case. In the alternative, the Plan contends that even if the district court correctly assigned the burden of proof, the Plan established, or at the very least raised a genuine issue of material fact regarding, causation. We affirm.

# II. BACKGROUND

## A. *Factual History*

### 1. The Proposed Transaction

Pioneer Centres Holding Company (Pioneer) owned and operated (through its subsidiaries) several automobile dealerships in Colorado and California, including Land Rover, Audi, and Porsche. In 2001, Pioneer sponsored the Plan under the Employee Retirement Income Security Act of 1974 (ERISA). Matthew "Jack" Brewer (Pioneer's founder), Robert Jensen (Pioneer's President), and Susan Dukes (Pioneer's Chief Financial Officer), served as the Plan's trustees. Mr. Brewer initially owned 100% of Pioneer's stock. Over the course of several years, Mr. Brewer sold 37.5% of his Pioneer stock to the Plan and retained 62.5% ownership.

In 2009, the Plan's trustees "proposed a stock transaction whereby the ESOP would become the 100% owner of Pioneer" (the "Transaction"). The Transaction included a stock redemption agreement, whereby Pioneer would redeem most of Mr. Brewer's shares, and a stock purchase agreement, whereby the Plan would purchase the remaining shares. Mr. Jensen and Ms. Dukes also held stock options that they would exercise and that Pioneer would then redeem as part of the Transaction. Because the trustees' interests in the transaction were adverse to those of the Plan, and to avoid any conflict of interest issues, the Plan hired Alerus as an independent "transactional trustee." Alerus's job was to determine whether, and on what terms, the Plan should purchase Mr. Brewer's shares.

## 2. Correspondence Between Pioneer and Land Rover

Pioneer's dealership agreement with Land Rover required approval before *any changes* in ownership or management occurred, stating: "[T]here will be no change in the foregoing [dealership ownership and management] in any respect without [Land Rover's] prior written approval." The agreement also granted Land Rover a right of first refusal to purchase any of Pioneer's stock offered for sale.

Pioneer sent a letter to Land Rover on August 17, 2009, in which it asked Land Rover to consent to Mr. Brewer's transfer of his remaining Pioneer stock to the Plan to make the Plan the 100% owner of Pioneer. The letter included the proposed terms of the Transaction and informed Land Rover that Pioneer's management would not change.

On August 31, 2009, Land Rover[1] responded that it had not received any previous notice, or request for approval, of the prior transfers of 37.5% of Mr. Brewer's stock to the Plan. Instead, Land Rover indicated that its records still showed Mr. Brewer as owning 100% of Pioneer's stock. Land Rover accordingly requested documentation of Mr. Brewer's previous transfers to the Plan, and "reminded" Pioneer that "changes in ownership may not be made without our prior, written approval." In addition, Land Rover "reserve[d] all of [its] rights with respect to any prior, unauthorized changes in ownership and any misrepresentations made in connection with the Dealer Agreement." Finally, Land Rover explained that because Pioneer had failed to send a complete buy/sell agreement (a formal proposal), Land Rover's right of first refusal with respect to the Transaction had not been triggered. To illustrate, Land Rover included a checklist of documents and information it requires before it will consider whether to approve a proposed ownership transfer.

On September 15, 2009, Pioneer sent a second letter to Land Rover, explaining that Pioneer's August 17 letter was not intended as a formal proposal, but rather as "an informal request for an opinion from [Land Rover] regarding any significant issues [it] may have regarding the proposed change of ownership to being 100% ESOP owned." Pioneer did not dispute that it never applied for or received Land Rover's authorization for the prior transfers, it explained, however, that it thought permission was unnecessary

---

[1] Carrie Catherine, one of Land Rover's Franchise Development Managers, signed this first letter. All of Land Rover's following letters were signed by Lee Maas, Ms. Catherine's supervisor and Land Rover's Vice President of Franchise Operations. Mr. Jensen authored most of Pioneer's correspondence.

4

because it was the ownership of the holding company (Pioneer) that had changed, not the ownership of Pioneer's dealerships.

On October 30, 2009, Land Rover responded that it had "a substantial objection regarding the previous changes of ownership that have resulted in [Pioneer] being 37.5% [Plan] owned." Because Pioneer had not previously disclosed or sought approval for these transfers, Land Rover maintained that each "was a material violation of the terms of the Land Rover Dealer Agreements," which require prior written approval before any change in ownership.

Land Rover further complained that in addition to not informing it of these transfers, Pioneer affirmatively misrepresented its ownership interest when Mr. Brewer signed a new dealership agreement in February 2005. In that agreement, Mr. Brewer listed himself as the only beneficial owner of Pioneer and as the 100% owner of Pioneer's stock. Land Rover considered this a "material misrepresentation" because "Mr. Brewer had already transferred 14.5%" of Pioneer's stock to the Plan at that time. Consequently, Land Rover "demand[ed] that all prior, unauthorized transfers of beneficial ownership be reversed and that ownership be restored to comply with the representations made in the [dealership agreements]."

Significant for our purposes, Land Rover also advised Pioneer that it would not approve a change in ownership to 100% Plan owned, because its "requirements for ownership/operation of its dealerships would foreclose such an arrangement." Land Rover explained that the "identity, reputation, financial resources, personal and business qualifications and experience, and the marketing philosophy of the designated owners

5

and management of [Pioneer] are of vital significance" to Land Rover. Land Rover

further stated that

> if majority ownership of a Land Rover Dealer were held by an ESOP, then the Dealer would ultimately be controlled by an ever-changing group of employees who have not been vetted for ownership and management by [Land Rover], and who may not have the requisite financial and personal capabilities, qualifications, experience and commitment. Further, control and management of the dealership would be subject to internal politics and factions. This is an unacceptable ownership structure for a Land Rover Dealer.

> Moreover, in this particular case, we are being asked to approve a transfer of full ownership following a series of undisclosed and unauthorized transfers in which both current ownership and the [Plan] participated.

On December 3, 2009, Pioneer (assisted by Alerus) responded, interpreting Land Rover's October 30 letter as announcing a prohibition against ESOP-owned dealerships, and asserting that this position violated California and Colorado law, as well as federal public policy favoring ESOP ownership. Pioneer also challenged some of Land Rover's reasoning for finding Plan ownership unacceptable. First, Pioneer explained that the same management team would stay in place after the transfer, because 100% of the stock in the dealerships would continue to be owned by the holding company (Pioneer), which in turn would be owned by the Plan. And the Plan would remain under the management of its trustees, Mr. Brewer, Mr. Jensen, and Ms. Dukes. Second, Pioneer claimed that "numerous studies" have shown ESOP-owned companies outperform competitors because the employees have a beneficial interest in the company and are motivated to help the company succeed. It is undisputed that Pioneer did not specifically identify or cite to a single study to support this claim.

6

On December 14, 2009, Land Rover wrote to Pioneer and clarified that it did not have a policy against all ESOP ownership. But Land Rover explained that its hesitation with respect to this Transaction was because "Pioneer never applied for nor received Land Rover's authorization for any of these prior transfers, in direct contravention of the Dealer Agreements," and because Pioneer misrepresented its ownership in 2005. Land Rover also took issue with Pioneer's arguments in favor of ESOP ownership. To begin, Land Rover indicated that even if management continued after the Transaction, it could change at any time and there was no guarantee of "who will ultimately control the dealership and be able to make changes in management and business direction." And Land Rover noted Pioneer's assertion that ESOPs outperform competitors was "not supported by the performance of your own dealerships." Whereas Land Rover sales were down 16% nationally that year, Pioneer's three Land Rover dealerships' sales were well below average, being down 45%, 35%, and 34%. Land Rover also observed that all three dealerships were below average on the Customer Satisfaction Index (CSI), and both Denver dealerships were unprofitable.[2]

Finally, Land Rover indicated that it had not yet received a formal ownership transfer proposal from Pioneer, but that Pioneer was

> free to submit any ownership transfer proposal that you wish to submit, and [Land Rover] will consider it in good faith and on the merits. . . . Any

---

[2] Pioneer contends that at the time of the Transaction, its "working capital exceeded Land Rover's guidelines by over 200%" and that its total capital was approximately $16.2 million. And although it argues it was only 1% below the average CSI, it does not dispute the sales numbers Land Rover provided and the fact that its two Denver dealerships were unprofitable.

proposal to transfer majority ownership to the [Plan], however, will have to address and satisfy the concerns [Land Rover] identified about the identity, business ability, and financial capability of the person(s) who will have ultimate legal control of the dealership.

Pioneer never responded to the December 14 letter.

Almost a year later, in a letter dated November 8, 2010, Land Rover approved the prior transfers of 37.5% of Pioneer's stock to the Plan. But Land Rover warned that it "would not support a future ownership change giving majority ownership or control" to the Plan, because Land Rover's "policy is that the person(s) who hold majority ownership and control of [a dealership] must be person(s) who are capable and committed to achieving and maintaining the level of retail representation" that Land Rover requires. This was the last communication between Pioneer and Land Rover on this issue.

### 3.  Negotiations Between Alerus and Pioneer

In November 2009, Alerus sent Mr. Brewer draft stock redemption and stock purchase agreements that required Mr. Brewer to make certain representations and warranties. Mr. Brewer's attorney, Richard Eason, revised the drafts by adding thirty-two "best of knowledge" qualifiers. In his transmittal letter, Mr. Eason told Alerus: "This is as far with the reps and warranties as [Mr. Brewer] will go." Mr. Eason hoped to obtain Alerus's signature on these revised Transaction documents, subject to later completing acceptable schedules. Because the schedules were likely to take "substantial time" to complete and Mr. Eason believed they were not of particular interest to the manufacturers, he intended to submit the signed revised Transaction documents to Land

8

Rover without the schedules. He hoped to trigger Land Rover's obligation to review and approve or reject the Transaction, or to exercise its right of first refusal.

But Alerus decided that the revisions to the representations and warranties were unacceptable and refused to sign the revised Transaction documents. As a result, Pioneer could not submit a signed copy of the revised Transaction documents to Land Rover.

Mr. Eason notified Mr. Brewer of Alerus's decision by email. In addition to explaining that Alerus was unwilling to accept the qualified representations and warranties, Mr. Eason opined that the "likelihood of a transfer of control to the ESOP appears even more unlikely in view of the letter" received from Land Rover. Mr. Eason explained that Land Rover

> continues to assert their position that the previous transfers to the ESOP were unauthorized and still subject to their approval or non-approval. The tone of [Land Rover's] letter suggests that they would probably not approve a change in control to the ESOP and we would be faced with some form of litigation with them. . . . I believe that [Land Rover] will ultimately approve the minority ownership by the ESOP but that change of control to the ESOP will be problematical.

Alerus ultimately determined that because Mr. Brewer was unwilling to make the unqualified representations and "assume the attendant risk, . . . the Plan should not purchase Brewer's stock." Formal Land Rover review was thus never triggered and the Transaction was abandoned. Alerus sent Pioneer a final invoice for its services in November 2010.

**4. Pioneer Sells Its Assets to Kuni**

More than a year after the Transaction was abandoned, Pioneer sold most of its assets to Kuni Enterprises for more than $10 million above what the Plan would have

paid for Pioneer's stock. Perhaps because it was an asset purchase rather than a stock purchase, Kuni did not require the unconditional representations and warranties that Alerus had demanded.[3] During the course of negotiations between Pioneer and Kuni, Mr. Jensen met with Kuni's representative, Greg Goodwin. When Mr. Goodwin inquired whether Pioneer employees would be disappointed that the Transaction had failed, Mr. Jensen told him that Land Rover had "indicated that the employee ownership in the company had maxed out . . . and [Pioneer] was not going to be allowed to add any [Plan] ownership in the future."

Mr. Goodwin was also present when Pioneer announced Kuni's purchase of Pioneer's assets. Mr. Goodwin recalled that Mr. Brewer "expressed regret that he was unable to complete his plan to sell Pioneer to the employees," and identified "the resistance or disapproval of one of the manufacturers" as a cause of that failure. After the asset sale to Kuni, the Denver Business Journal reported that Mr. Jensen had identified the reason for the failure of the stock sale to the Plan as "the [fact that] manufacturers weren't willing to deal with a company that was 100 percent employee-owned."

---

[3] *See, e.g.*, *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006) ("Under both New York law and traditional common law, a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities."); *ARE Sikeston Ltd. P'ship v. Weslock Nat'l, Inc.*, 120 F.3d 820, 828 (8th Cir. 1997) (noting "the traditional distinction between corporate mergers or the sale and purchase of outstanding stock of a corporation, whereby preexisting corporate liabilities also pass to the surviving corporation or to the purchaser, and the sale and purchase of corporate assets which eliminates successor liability" (internal quotation marks omitted)); William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Corporations § 7122 (Sept. 2016 update) ("The general rule, which is well settled, is that where one company sells or otherwise transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor." (collecting cases)).

### B. *Procedural History*

After Pioneer sold its assets to Kuni, the Plan filed suit against Alerus[4] for breach of fiduciary duty under 29 U.S.C. § 1109. Alerus moved for summary judgment,[5] arguing (1) it did not breach any fiduciary duties, and (2) even if there was a breach, Alerus did not cause any losses to the Plan because the Plan did not establish that Land Rover would have approved the Transaction.

**1. The Plan's Experts**

The Plan hired two experts to opine on whether Land Rover would have approved a formal proposal for 100% ESOP ownership of Pioneer's stock. The first expert, Carl Woodward, is a certified public accountant who believed Land Rover would have approved the transaction because: (1) multi-owner dealerships have become common; (2) the factors Land Rover considers in deciding whether to approve a change of ownership weigh in the Plan's favor; (3) applicable state law requires manufacturers to be objectively reasonable in deciding whether to approve, and there is no objective reason for Land Rover to withhold approval; (4) Land Rover would not have exercised its right of first refusal because it would have had to own and operate other brands' dealerships (Porsche and Audi); (5) Land Rover's statement that it "would not support" the Plan's

---

[4] The Plan also sued its former counsel, Berenbaum Weinshienk, P.C., but the parties filed a stipulation to dismiss it from the action, which we approved on December 30, 2015.

[5] Alerus also filed a cross-appeal seeking contribution or indemnification. Because we are affirming the district court, we dismiss the cross-appeal as moot. *See Alerus Fin., N.A. v. Brewer*, No. 15-1245 (10th Cir. June 5, 2017).

11

ownership change was just "code" that it "might allow but would not yet positively 'approve'"; and (6) Porsche and Audi had approved the Transaction.

The second proposed expert, Oren Tasini, is an attorney "with decades' experience in the purchase and sale of automobile dealerships," who opined that "under California and Colorado law, Land Rover would have been *required* to consent to the sale to the [Plan]." He based this opinion on his view that California and Colorado laws favor approval of dealership transfers and prohibit manufacturers from "unreasonably" withholding consent. Mr. Tasini believed it would have been unreasonable for Land Rover not to approve the Transaction, particularly because it had agreed to the prior transfer of 37.5% of the stock.

Neither Mr. Woodward nor Mr. Tasini had any personal involvement with a proposed ESOP stock purchase in the automotive industry generally, or with Land Rover's approval process specifically.

**2. Land Rover's 30(b)(6) Testimony**

George Delaney, one of Land Rover's Franchise Development Managers, testified as Land Rover's 30(b)(6) witness. Mr. Delaney confirmed that Land Rover follows the law, acts reasonably, and has no policy against ESOPs. He estimated that Land Rover rejects less than one-third of change of control applications. Mr. Delaney also testified that Land Rover exercises its right of first refusal a "minority of the time."

But Mr. Delaney could not "say . . . without speculation" whether Land Rover would have approved the Transaction.[6] When presented with the revised Transaction documents, Mr. Delaney testified, "If I had received this document, it still would not be a complete amount of information for me to make a recommendation." He explained that the documents were missing several items contained on the checklist Land Rover sent Pioneer with its first letter. Mr. Delaney indicated that he "certainly" would have had an interest in seeing at least some of the schedules. Thus, even if Alerus had sent the signed Transaction documents without the schedules as hoped by Mr. Eason, Mr. Delaney stated the documents as submitted would not have triggered Land Rover's formal approval obligation because the documents were "not complete."

## 3. District Court Grants Summary Judgment

The district court bypassed the issue of whether Alerus had breached its fiduciary duty because it concluded the Plan had not established loss, an element of its prima facie case. The court explained that the Plan's claimed damages were from the "proposed transaction and resulting benefits," but there was insufficient "evidence that the proposed transaction would have been consummated" because it was only speculative that Land Rover's "approval would have occurred." The court reasoned that at "all material times, Land Rover indicated it would not approve and/or recommend the approval of the complete change of ownership from [Mr.] Brewer to the ESOP." Additionally, "[Mr.]

_____

[6] Mr. Delaney reported to Mr. Maas. His job was to recommend whether Land Rover should approve or deny a potential sale, but he did not have authority himself to approve or deny. Mr. Maas, however, did have authority to approve or deny potential sales.

13

Delaney, the only Land Rover representative relied on by the parties, stated it would be speculative as to whether Land Rover would have approved." The court explained that "[s]peculation . . . is not sufficient to establish causation," and "in the absence of causation, the [Plan] is unable to show it has been damaged by the [alleged] breach of any duty."

Although the court acknowledged a split of authority on whether the burden shifts to the defendant to disprove causation once the plaintiff has established a prima facie case of breach of fiduciary duty under ERISA, it did not resolve that issue. Instead, the district court found the Plan had failed to meet its initial burden of "showing . . . a causal connection between the breach of fiduciary duty and claimed loss as part of its prima facie case of loss." The court therefore determined that "even assuming Alerus, as the fiduciary, must disprove causation, [the Plan] has not established a *prima facie* case of a loss in the first instance."

In considering the evidence of causation, the district court excluded the testimony of Mr. Woodward and Mr. Tasini insofar as it related to whether Land Rover would have approved the Transaction. The court explained that "both opinions would require the experts to 'read the mind' of Land Rover, predict how Land Rover would have weighed factors it deemed relevant, and find that Land Rover would not only reach the conclusion that it must consent but also do so." The court observed that not even Land Rover would speculate as to whether it would have approved the Transaction, and further concluded that such a prediction "is beyond the scope of any expert in this instance." As an alternative basis for its ruling, the court found that both experts offered impermissible

14

legal conclusions, when "neither expert may opine as to what the law requires." The court also found Mr. Woodward unqualified to testify as to what the law requires because he is a CPA, not an attorney.

The district court granted summary judgment to Alerus, and the Plan now appeals. We have jurisdiction under 28 U.S.C. § 1291.

## III. DISCUSSION

The Plan claims Alerus breached its fiduciary duties under ERISA by failing to execute the revised Transaction documents so that Alerus could send them to Land Rover for approval, and is thus liable under 29 U.S.C. § 1109(a), which provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan *any losses to the plan resulting from each such breach* . . . .

29 U.S.C. § 1109(a) (emphasis added).

The district court concluded the Plan could not demonstrate a resulting loss because the evidence that Land Rover would have approved the Transaction was too speculative. The Plan contends this was error because the district court improperly required the Plan to prove causation, rather than shifting the burden to Alerus to disprove causation. And even if the district court did not erroneously assign the burden of proof, the Plan contends the evidence proved, or at least created a genuine dispute of material fact, that Land Rover would have approved the Transaction because: (1) record evidence of Land Rover and Pioneer's relationship showed Land Rover would have approved; (2) California and Colorado state law would have required Land Rover to approve; and

15

(3) the Plan's experts would have testified that Land Rover would have approved, had the district court not abused its discretion in excluding their testimony.

We review the district court's grant of summary judgment de novo. *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1251 (10th Cir. 2015). Although causation is generally a question of fact for a jury, where "the facts are undisputed and reasonable minds can draw only one conclusion from them," causation is a question of law for the court. *Berg v. United States*, 806 F.2d 978, 981 (10th Cir. 1986). After the moving party has met its initial burden of showing an absence of a genuine issue of material fact, "the burden then shifts to the nonmoving party, who must offer evidence of specific facts that is sufficient to raise a 'genuine issue of material fact.'" *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1097 (10th Cir. 1999) (citation omitted). "To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). The district court must draw all reasonable inferences in favor of the nonmoving party. *Hornady Mfg. Co. v. Doubletap, Inc.*, 746 F.3d 995, 1004 (10th Cir. 2014). But an inference is unreasonable if it requires "a degree of speculation and conjecture that renders [the factfinder's] findings a guess or mere possibility." *United States v. Bowen*, 527 F.3d 1065, 1076 (10th Cir. 2008) (internal quotation marks omitted). The nonmoving party "must set forth evidence sufficient for a reasonable jury to return a verdict in [its] favor." *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999); *Schutz v. Thorne*, 415 F.3d 1128, 1132 (10th Cir. 2005).

In reviewing the Plan's challenges to the district court's decision, we first address the proper allocation of the burden of proof with respect to the element of causation in an ERISA breach of fiduciary duty claim. We conclude that the plaintiff bears the burden on each element of its claim because Congress has given no indication that it intended to depart from that general rule. We also reject the Plan's argument that a burden-shifting framework should be incorporated into ERISA from the common law of trusts.

Next, we consider whether the Plan met its burden at summary judgment to come forward with evidence from which a reasonable jury could find in its favor on each element of its breach of fiduciary duty claim. We agree with the district court that a reasonable factfinder could not conclude that Alerus caused the Transaction to fail because even if Land Rover had received the revised Transaction documents, the evidence does not rise beyond speculation that Land Rover would have approved the Transaction. In fact, all of the record evidence demonstrates that Land Rover would not have approved. Finally, we conclude the district court did not abuse its discretion in excluding the Plan's expert testimony on causation.

### A. *The Burden of Proving Causation Falls on the Plaintiff in an ERISA Breach of Fiduciary Duty Claim*

29 U.S.C. § 1109(a) provides that a fiduciary who breaches its duties under ERISA shall be personally liable for "any losses to the plan resulting from each such breach." The plain language of § 1109(a) establishes liability for losses "resulting from" the breach, which we have recognized indicates that "there must be a showing of some causal link between the alleged breach and the loss plaintiff seeks to recover." *Allison v.*

*Bank One-Denver*, 289 F.3d 1223, 1239 (10th Cir. 2002) (internal quotation marks

omitted); *see also Plasterers' Local Union No. 96 Pension Plan v. Pepper*, 663 F.3d 210,

217 (4th Cir. 2011) (holding a breach of fiduciary duty "does not automatically equate to

causation of loss and therefore liability" and consequently a "fiduciary can only be held

liable upon a finding that the breach actually caused a loss to the plan"); *Willett v. Blue*

*Cross & Blue Shield*, 953 F.2d 1335, 1343 (11th Cir. 1992) ("Section 409 of ERISA

establishes that an action exists to recover losses that 'resulted' from the breach of a

fiduciary duty; thus, the statute does require that the breach of the fiduciary duty be the

proximate cause of the losses claimed . . . .").

But the statute is silent as to *who* bears the burden of proving a resulting loss.

Where a statute is silent on burden allocation, the "ordinary default rule [is] that plaintiffs

bear the risk of failing to prove their claims."[7] *Schaffer ex rel. Schaffer v. Weast*, 546 U.S.

49, 56 (2005). This is because the "burdens of pleading and proof with regard to most

facts have been and should be assigned to the plaintiff who generally seeks to change the

present state of affairs and who therefore naturally should be expected to bear the risk of

failure of proof or persuasion." 2 McCormick on Evid. § 337 (7th ed. 2013).

---

[7] The Supreme Court has held that plaintiffs bear the burden of proof in a variety
of cases where the statute or Constitution is silent. *See, e.g.*, *St. Mary's Honor Ctr. v.
Hicks*, 509 U.S. 502, 511 (1993) (Title VII); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561
(1992) (Endangered Species Act); *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795,
806 (1999) (Americans with Disabilities Act); *Wharf (Holdings) Ltd. v. United Int'l
Holdings, Inc.*, 532 U.S. 588, 593 (2001) (Rule 10b-5 securities fraud); *Doran v. Salem
Inn, Inc.*, 422 U.S. 922, 931 (1975) (preliminary injunctions); *Hunt v. Cromartie*, 526
U.S. 541, 553 (1999) (Equal Protection Clause); *Mt. Healthy City Sch. Dist. Bd. of Ed. v.
Doyle*, 429 U.S. 274, 287 (1977) (First Amendment).

18

There are exceptions to the default rule, such as when "certain elements of a plaintiff's claim . . . can fairly be characterized as affirmative defenses or exemptions." *Schaffer*, 546 U.S. at 57; *see also FTC v. Morton Salt Co.*, 334 U.S. 37, 44–45 (1948) ("[T]he burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits . . . ."). The Supreme Court cautioned, however, that "while the normal default rule does not solve all cases, it certainly solves most of them. . . . Absent some reason to believe that Congress intended otherwise, . . . the burden of persuasion lies where it usually falls, upon the party seeking relief." *Schaffer*, 546 U.S. at 57–58.

Another exception to the default rule unique to the fiduciary duty question arises under the common law of trusts. Trust law advocates a burden-shifting paradigm whereby once "a beneficiary has succeeded in proving that the trustee has committed a breach of trust and that a related loss has occurred, the burden shifts to the trustee to prove that the loss would have occurred in the absence of the breach." Restatement (Third) of Trusts § 100 cmt. f (2012); *see also* George G. Bogert & George T. Bogert, *The Law of Trusts and Trustees* § 871 (2d rev. ed. 1995 & Supp. 2013) ("If [a beneficiary] seeks damages, a part of his burden will be proof that the breach caused him a loss. . . . If the beneficiary makes a prima facie case, *the burden of contradicting it . . . will shift to the trustee*." (emphasis added)).

Here, the district court found it unnecessary to decide whether to adopt the burden-shifting approach because, even assuming Alerus carries the burden to disprove causation once the Plan establishes a prima facie case, it concluded the Plan had not established a

19

prima facie case of a loss in the first instance. We adopt a different analytical approach and reject outright the Plan's argument that ERISA breach of fiduciary duty claims should be resolved under a burden-shifting framework. But we affirm the district court because we agree the Plan has failed to meet its burden.

To begin, there is nothing in the language of § 1109(a) or in its legislative history that indicates a Congressional intent to shift the burden to the fiduciary to disprove causation. Nor is there anything that suggests Congress intended to make the lack of causation an affirmative defense or an exemption to liability. Whether something constitutes an element, as opposed to an affirmative defense or exception, turns on whether "one can omit the exception from the statute without doing violence to the definition of the offense."[8] *United States v. Prentiss*, 256 F.3d 971, 979 (10th Cir. 2001) (en banc) (internal quotation marks omitted), *overruled in part on other grounds as recognized by United States v. Langford*, 641 F.3d 1195 (10th Cir. 2011). Section 1109(a) of ERISA imposes liability on a breaching fiduciary for "any losses to the plan resulting from each such breach." 29 U.S.C. § 1109(a). The requirement that the losses to the plan have resulted from the breach cannot be omitted from the statute without substantially changing the definition of the claim, thereby doing violence to it. We thus hold that causation is an element of the claim and that the plaintiff bears the burden of proving it.

---

[8] For example, the Age Discrimination in Employment Act contains an exemption for employer actions "based on reasonable factors other than age" and the Supreme Court held that it was the employer-defendant's burden to prove it meets this exemption. *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 87 (2008).

The majority of federal circuits that have considered the issue agree. These courts have refused to incorporate any burden shifting into ERISA breach of fiduciary duty claims because the language "resulting from" in 29 U.S.C. § 1109(a) makes "[c]ausation of damages . . . an element of the claim, and the plaintiff bears the burden of proving it." *Silverman v. Mut. Benefit Life Ins. Co.*, 138 F.3d 98, 105 (2d Cir. 1998) (Jacobs, J. and Meskill, J., concurring); *see also Wright v. Ore. Metallurgical Corp.*, 360 F.3d 1090, 1099 (9th Cir. 2004); *Kuper v. Iovenko*, 66 F.3d 1447, 1459–60 (6th Cir. 1995) *abrogated on other grounds by Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014); *Willett v. Blue Cross & Blue Shield of Ala.*, 953 F.2d 1335, 1343–44 (11th Cir. 1992).

In contrast, some circuits have incorporated the common law of trust's burden shifting into ERISA breach of fiduciary duty claims. The Fourth, Fifth, and Eighth Circuits have held that once an ERISA plaintiff has proven a breach and a prima facie case of loss to the plan, "the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by the breach of duty."[9] *See Tatum v. RJR Pension Inv. Comm.*, 761

---

[9] Additionally, several circuits shift the burden but only with respect to the calculation of damages and only after the plaintiff has made its prima facie case. *See, e.g.*, *Sec'y of U.S. Dep't of Labor v. Gilley,* 290 F.3d 827, 830 (6th Cir. 2002) ("To the extent that there is any ambiguity in determining *the amount of loss* in an ERISA action, the uncertainty should be resolved against the breaching fiduciary." (emphasis added)); *Brick Masons Pension Tr. v. Indus. Fence & Supply*, 839 F.2d 1333, 1338 (9th Cir. 1988) (holding where plaintiffs have demonstrated the employer breached ERISA by failing to keep adequate records, burden shifted to employer to demonstrate how much of work in question was not covered by agreement); *cf. Leigh v. Engle*, 727 F.2d 113, 138 (7th Cir. 1984) ("[T]he burden is on the defendants who are found to have breached their fiduciary duties to show *which profits are attributable to their own investments* apart from their control of the [trust] assets." (emphasis added)); *Barry v. West*, 503 F. Supp. 2d 313, 326 (D.D.C. 2007) (holding "only after plaintiff demonstrates that [defendant's] breach of duty caused a loss to the Plan can any 'uncertainties in fixing damages' be resolved in

F.3d 346, 362 (4th Cir. 2014) (internal quotation marks omitted), *cert. denied*, 135 S. Ct. 2887 (2015); *McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995); *Martin v. Feilin*, 965 F.2d 660, 671 (8th Cir. 1992).

The Plan asks us to follow these decisions and shift the burden to the fiduciary once the plaintiff establishes a prima facie showing of a loss related to the breach. We decline that invitation. The "law of trusts often will inform, but will not necessarily determine the outcome of, an effort to interpret ERISA's fiduciary duties." *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996). Where the plain language of the statute limits the fiduciary's liability to losses *resulting from* a breach of fiduciary duty, there seems little reason to read the statute as requiring the plaintiff to show only that the loss is *related* to the breach. And, as the Second Circuit observed in *Silverman*, the burden-shifting framework could result in removing an important check on the otherwise sweeping liability of fiduciaries under ERISA. *See Silverman*, 138 F.3d at 106 (Jacobs, J. and Meskill, J., concurring) ("The causation requirement of § 1109(a) acts as a check on this broadly sweeping liability, to ensure that solvent companies remain willing to undertake fiduciary responsibilities with respect to ERISA plans.").

In sum, we see no reason to depart from the "ordinary default rule that plaintiffs bear the risk of failing to prove their claims." *Schaffer*, 546 U.S. at 56. Viewing the plain language, causation cannot "fairly be characterized as [an] affirmative defense[] or exemption[]," *id.* at 57, but is an express element of a claim for breach of fiduciary duty

---

plaintiff's favor"). But because that issue is not before us here, we leave this question for another day.

under 29 U.S.C. § 1109(a). We therefore hold that the burden falls squarely on the plaintiff asserting a breach of fiduciary duty claim under § 1109(a) of ERISA to prove losses to the plan "resulting from" the alleged breach of fiduciary duty.

We next turn to the question of whether the Plan met that burden. For the reasons we now explain, we agree with the district court that it did not.

**B.** ***The District Court Correctly Concluded the Plan Failed to Come Forward with Sufficient Evidence of Causation to Survive Summary Judgment***

As explained above, by suing Alerus for breach of fiduciary duty, the Plan assumed the burden of proof on each element of its claim. In order to prove the causation element, the Plan must demonstrate that Alerus's alleged breach (refusal to sign the revised Transaction documents) caused the Plan to suffer damages (failure of the Transaction). The Plan therefore bears the burden of establishing by a preponderance of the evidence—more likely than not—that Land Rover would have approved the sale had Alerus signed the revised Transaction documents, which would have allowed Pioneer to submit them to Land Rover for review. For the Plan to defeat Alerus's motion for summary judgment, it "must set forth evidence sufficient for a reasonable jury to return a verdict in [its] favor." *Rice*, 166 F.3d at 1092. And this evidence "must be based on more than mere speculation, conjecture, or surmise." *Bones*, 366 F.3d at 875.

The district court concluded the evidence of causation could not rise above speculation because Land Rover gave every indication it would not approve the sale, and thus Alerus's failure to sign the documents more likely than not did not result in the loss of the Transaction.

23

On appeal, the Plan ignores Land Rover's repeated and consistent statements that it would not approve the Transaction and contends that "[h]ad the court appropriately considered and applied state law and presumed Land Rover would obey that law, it could only have drawn the conclusion that Land Rover approval . . . was probable or, at a minimum, a genuine issue of fact in that regard had been established."

In addressing this argument, we begin by reviewing the record evidence as a whole and determining that it overwhelmingly points to only one conclusion: Land Rover would not have approved the Transaction, even if Alerus had signed the revised Transaction documents. We next reject the Plan's argument that Land Rover would have approved the sale if Alerus had signed the documents because Colorado and California law would have required Land Rover to do so. To the contrary, the record evidence indicates that even in the face of references to the state laws and Land Rover's alleged legal obligations, Land Rover steadfastly refused to approve 100% Plan ownership. And the dissent's suggestion that Pioneer would have successfully sued Land Rover if it had not approved is irrelevant and forfeited. Last, we conclude the district court did not abuse its discretion in excluding the Plan's expert testimony regarding whether Land Rover would have approved the Transaction. Accordingly, we hold the district court correctly granted summary judgment in favor of Alerus because the Plan failed to come forward with any evidence from which the jury could find causation without engaging in speculation.

1. **Record Evidence Regarding Approval**

Throughout the communications with Pioneer, Land Rover repeatedly and consistently indicated it would not approve any further attempts to transfer stock from Mr. Brewer to the Plan:

- Land Rover "would not support a future ownership change giving majority ownership or control to an ESOP."

- Land Rover's "requirements for ownership/operation of its dealerships would foreclose such an arrangement."

- "This is an unacceptable ownership structure for a Land Rover Dealer."

- Pioneer was asking Land Rover "to approve a transfer of full ownership following a series of undisclosed and unauthorized transfers in which both current ownership and the ESOP participated."

- Land Rover believed Pioneer committed a "material misrepresentation" when Mr. Brewer listed himself as Pioneer's 100% owner in 2005 when he had already transferred 14.5% of Pioneer's stock to the Plan at that time.

- Land Rover did not "condone the prior, unauthorized transfers of stock" and would "not tolerate any recurrence of the practice of making transfers without [Land Rover's] prior written approval."

- Mr. Delaney testified that Land Rover's relationship with Pioneer was not "very favorable at the time, because they didn't tell us for half a dozen years that they had sold off a third of the company. That's a substantive violation of the Land Rover Dealer Agreement, that's important to us."

- Mr. Delaney testified it was a "red flag" that "Mr. Brewer hadn't been completely honest with us for several years, [during] which he did not tell us that he had sold a portion of the company, and he had signed renewals of the Land Rover Agreement saying that he still owned 100 percent."

On December 14, 2010, after Alerus and Pioneer warned Land Rover that its refusal to approve an ESOP-owned dealership might be unlawful, Land Rover reiterated

25

its concerns about such an arrangement. And when, almost a year later, Land Rover approved the prior transfers of 37.5% of Pioneer's stock to the Plan, it unequivocally stated that Land Rover "would not support a future ownership change giving majority ownership or control" to the Plan. This was Land Rover's final word on the issue, and it came from Lee Maas, Land Rover's Vice President of Franchise Operations, who had authority to reject the Transaction. Pioneer presented no admissible evidence that Land Rover would have changed course and approved the Transaction.[10]

There is also substantial evidence that Land Rover effectively communicated its position to Pioneer representatives and that they understood Land Rover would not approve the Transaction. First, Mr. Eason told Mr. Brewer in September 2010:

> The likelihood of a transfer of control to the ESOP appears even more unlikely in view of the letter [Pioneer] received from Lee Maas . . . which continues to assert their position that the previous transfers to the ESOP were unauthorized and still subject to their approval or non-approval. The tone of his letter suggests that they would probably not approve a change in control to the ESOP and we would be faced with some form of litigation with them.

And although Mr. Eason believed that Land Rover would "ultimately approve the [37.5%] ownership by the ESOP," he told Mr. Brewer "that change of control to the

---

[10] The dissent relies on Alerus's failure to counter the Plan's expert report on the benefits of ESOP ownership "with any evidence suggesting that employee ownership negatively affects performance." Dissent 10-11. But the expert report was not provided during the correspondence between Land Rover and Pioneer. The only evidence Land Rover had at the relevant time was Pioneer's unsubstantiated claim that "numerous studies" have shown that ESOP companies outperform non-ESOP companies. And as Alerus noted in its response, Land Rover's experience with Pioneer did not support this theory. In examining causation, only evidence available to Land Rover at the time the transaction failed is relevant.

ESOP will be problematical." Second, Mr. Jensen told Kuni that Land Rover declined the Transaction. Third, Mr. Brewer attributed the failure of the Transaction to the "resistance or disapproval on the part of . . . one manufacturer." And because the evidence is undisputed that the other two manufacturers approved the Transaction, the only manufacturer who could have disapproved was Land Rover. Last, Mr. Jensen told the Denver Business Journal that "the manufacturers weren't willing to deal with a company that was 100 percent employee-owned," and therefore Pioneer "had no other options to look at but to find a buyer." Mr. Jensen's statement that Pioneer "had no other option[] . . . but to find a buyer" would only be true if Land Rover was not going to approve the Transaction.

In light of this undisputed evidence, and lack of any evidence to the contrary, a reasonable jury could not conclude Land Rover would have approved the Transaction.[11] Consequently, the district court did not err in determining that the Plan failed to meet the threshold necessary to survive summary judgment on the issue of causation. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 780 (10th Cir. 2013) ("Mere speculation . . . is not sufficient to establish causation.").

---

[11] The dissent claims a factfinder could conclude the Plan did not know about Mr. Brewer's deceptive transfers, and that "Land Rover should have relished the opportunity to deal with two . . . innocent trustees and the plan rather than an individual who had acted deceptively." Dissent p. 29. But there is no record evidence to support such a finding. To the contrary, in its October 30, 2009, letter to Pioneer, Land Rover revealed its belief that the Plan was complicit in the deception: "Moreover, in this particular case, we are being asked to approve a transfer of full ownership following a series of undisclosed and unauthorized transfers in which both current ownership and the [Plan] participated."

27

## 2. State Law Arguments

Despite Land Rover's clear indication it would not approve greater Plan ownership, the Plan claims summary judgment was improper because it would have been unreasonable—and thus illegal under California and Colorado law—for Land Rover not to approve the Transaction. The Plan argues "Land Rover was aware of [the] state laws and their application, and followed them as a matter of practice," and because we "presume[] that a person obeys the law," *NLRB v. Shawnee Indus., Inc.*, 333 F.2d 221, 225 (10th Cir. 1964), it therefore follows that a jury could reasonably conclude that Land Rover would have followed the law and approved the Transaction. We disagree.

The record evidence on this topic supports but one conclusion: That Land Rover would not approve 100% Plan ownership. In its communications with Land Rover, the Plan raised the very state laws that it relies on here to argue that a failure to approve the Transaction would be illegal. Despite that thinly-veiled threat, Land Rover's final letter stated that it would retroactively approve the prior transfer of 37.5% to the Plan, but that it "would not support a future ownership change giving majority ownership or control" to the Plan. Thus, despite the Plan's position that approval was required by law, Land Rover clearly indicated that it would not approve the Transaction.[12] Any contrary finding

---

[12] Mr. Delaney testified that he believed the word "support" indicated Mr. Maas may have "need[ed] more than just his own opinion to approve anything more on the ESOP" and that while the statement "certainly does not mean that the company will [approve]," it "seem[ed] to leave open the possibility of [approval] in the future." But Mr. Delaney's speculation about what Mr. Maas meant when he used the word "support" is not evidence. And it is inconsistent with Mr. Maas's communications over the past thirteen months indicating Land Rover would not accept further transfers of ownership to the Plan.

28

therefore would require the jury to engage in speculation that is unsupported by and, in fact, contradictory to the evidence. In the face of such speculation, the Plan cannot rely on *Land Rover's* alleged obligations to Pioneer under state law to establish that *Alerus* caused the Transaction to fail.

The dissent takes the Plan's argument one step further by assuming that if Land Rover had done exactly what it said it would do—reject any further transfers of stock from Mr. Brewer to the Plan—Pioneer could have successfully sued Land Rover for violations of Colorado and California law. But the Plan is not suing Land Rover; it is suing Alerus. And the issue here is whether *Alerus's* alleged breach of its duties to the Plan by not signing the revised Transaction documents so that Pioneer could submit the documents to Land Rover caused the Transaction to fail. Because the evidence supports only the finding that the Transaction failed because Land Rover would not approve further transfers of stock to the Plan, summary judgment for Alerus is proper for lack of causation, irrespective of whether Pioneer has a valid claim against Land Rover under state law.[13]

---

[13] Although not relevant to Alerus's liability, we note that Land Rover's state law obligations are far from certain. California law permits a manufacturer to reasonably reject a transfer due to omissions and misrepresentations of the dealer. *See Fladeboe v. Am. Isuzu Motors Inc.*, 58 Cal. Rptr. 3d 225, 241 (Cal. Ct. App. 2007) ("A manufacturer has the right to expect honesty and good faith from its dealers, and therefore may consider those qualities when assessing a request for a dealership transfer."); *see also In re R.B.B., Inc.*, 211 F.3d 475, 480 (9th Cir. 2000) ("An automobile manufacturer with a special line of luxury motor cars and unhappy experience with an unreliable dealer . . . [is] not unreasonable" in refusing to approve a sale); *cf. Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 923 F. Supp. 2d 745, 764 (D. Md. 2013) (interpreting a similar Maryland statute and concluding "it would be manifestly unreasonable to require a manufacturer to enter into a franchise agreement with a party with which it has ongoing

29

And even if we were to assume that a hypothetical lawsuit between Pioneer and Land Rover is relevant to whether Alerus caused the Transaction to fail in the first instance, the Plan never raised this argument below and consequently, neither party argued or moved to admit evidence on whether a lawsuit between Pioneer and Land Rover was probable or likely to succeed. In the district court, the Plan argued Land Rover would have approved the Transaction in order to be in compliance with state law, but it never based causation on a hypothetical lawsuit between Pioneer and Land Rover. Thus, the Plan forfeited this argument by failing to raise it in the district court where it could be tested factually. *See Finstuen v. Crutcher*, 496 F.3d 1139, 1145 n.3 (10th Cir. 2007) ("The general rule is that an appellate court will not consider an issue raised for the first time on appeal." (alterations and internal quotation marks omitted)).

## 3. The Plan's Experts

Finally, the Plan contends that the district court improperly excluded expert testimony from which the jury could have found that Land Rover would have approved the Transaction. We review the district court's decision to exclude expert opinions for abuse of discretion. *United States v. Avitia-Guillen*, 680 F.3d 1253, 1256 (10th Cir.

---

business disputes, including matters of business integrity"). Here, it is undisputed that Mr. Brewer transferred 37.5% of his ownership to the Plan over the course of several years without disclosing the transfers to Land Rover. And then in a 2005 dealership agreement, he affirmatively misrepresented his ownership interest by indicating that he still owned 100% of Pioneer's stock, when he had already transferred 14.5% of that stock to the Plan. Further, while we have found no decisions directly on point interpreting Colorado's statute, we are convinced it too would permit Land Rover to reject the Transaction under these circumstances.

2012). We will "reverse only if the district court's conclusion is arbitrary, capricious, whimsical or manifestly unreasonable or when we are convinced that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Id.* (internal quotation marks omitted). But "whether the district court applied the proper [legal] standard in admitting expert testimony" is reviewed de novo. *Id.*

Expert testimony must be relevant and reliable. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Ind.*, 509 U.S. 579, 588–89 (1993). To be reliable, expert testimony must be "based on actual knowledge, and not mere 'subjective belief or unsupported speculation.'" *Mitchell v. Gencorp., Inc.*, 165 F.3d 778, 780 (10th Cir. 1999) (quoting *Daubert*, 509 U.S. at 590). Further, a district court "is accorded great latitude in determining how to make *Daubert* reliability findings." *United States v. Velarde*, 214 F.3d 1204, 1209 (10th Cir. 2000). When expert opinion "is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict" and will be excluded. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).

The district court excluded the testimony offered by the Plan's experts regarding causation for several independent reasons. First, the court found the experts' "proffered opinions amount to nothing more than speculation." *See Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000) ("It is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate."). If Land Rover itself was

31

unable to say, without speculation, whether the Transaction would have been approved, then the experts would similarly not be able to form an opinion without speculating. As the district court reasoned,

> both opinions would require the experts to "read the mind" of Land Rover, predict how Land Rover would have weighed factors it deemed relevant, and find that Land Rover would not only reach the conclusion that it must consent but also do so. Such prediction, however, is beyond the scope of any expert in this instance.[14]

*See Luciano v. E. Cent. Bd. of Coop. Educ. Servs.*, 885 F. Supp. 2d 1063, 1072 (D. Colo. 2012) (excluding portion of expert's opinion where he attempted to opine on what was motivating the behavior of a student's parents, noting the expert could not "speculate on the parents' state of mind").

Second, the court excluded the testimony because it found the experts made impermissible legal conclusions.[15] Mr. Tasini opined "that under California and Colorado law, Land Rover would have been required to consent to the sale to the [Plan]." But an "expert may not state his or her opinion as to legal standards nor may he or she state legal

---

[14] The district court also excluded Wayne Isaacks' and the non-retained experts' opinions so far as they pertained to "the Land Rover issue," noting in a footnote that it incorporated the same reasoning as in the exclusion of Mr. Tasini and Mr. Woodward. The Plan argues on appeal that "[n]owhere did the court explain its exclusion of Isaacks and the non-retained experts, . . . and this Court should treat the exclusion [as] an abuse of discretion." But the court did address it, by incorporating by reference the same reasoning advanced to exclude the other experts, which it was within its discretion to do.

[15] The Plan contends the district court abused its discretion because "even if elements of their testimony might be excluded as involving a legal instruction, wholesale exclusion was incorrect." But the Plan ignores the fact that the district court relied on several independent reasons for excluding the opinions, not just on its finding that the experts made improper legal conclusions.

conclusions drawn by applying the law to the facts." *Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1328 (10th Cir. 1998). This type of opinion does "not aid the jury in making a decision, but rather attempts to substitute [the expert's] judgment for the jury's." *Baumann v. Am. Family Mut. Ins. Co.*, 836 F. Supp. 2d 1196, 1202 (D. Colo. 2011); *see also United States v. Hill*, 749 F.3d 1250, 1260 (10th Cir. 2014) ("[A]n expert may not go so far as to usurp the exclusive function of the jury to weigh the evidence and determine credibility." (internal quotation marks omitted)); *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988) ("[T]estimony on the ultimate factual questions aids the jury in reaching a verdict; testimony which articulates and applies the relevant law, however, circumvents the jury's decision-making function by telling it how to decide the case."); *United States v. Jensen*, 608 F.2d 1349, 1356 (10th Cir. 1979) ("[A]n expert witness cannot state legal conclusions by . . . passing upon weight or credibility of the evidence . . . .")

Finally, the district court found Mr. Woodward "is a C.P.A. and is not qualified to testify on this subject." The Plan argues the district court abused its discretion by finding Mr. Woodward unqualified because it only considered Mr. Woodward's licensure, and "disregarded [Mr.] Woodward's unparalleled experience and involvement in single and multiple franchise automobile dealership buy-sells requiring manufacturer approval." But the district court did not abuse its discretion by identifying the fact that Mr. Woodward is not an attorney as an additional reason for not permitting him to testify as to whether refusal would have been contrary to law, where the decision is otherwise adequately supported.

Under these circumstances, we cannot conclude that the district court exceeded its considerable discretion in excluding the expert testimony. And in the absence of any evidence to contradict Land Rover's unambiguous contemporaneous statements that it would not approve 100% ESOP ownership of the dealership, no reasonable jury could find causation.

## IV.    CONCLUSION

We decline to adopt a burden-shifting approach under 29 U.S.C. § 1109 and hold it is the plaintiff's burden to establish causation on a breach of fiduciary duty claim. We also affirm the district court's conclusion that the Plan's evidence of causation would have required the jury to engage in speculation. And we conclude the district court did not abuse its discretion in excluding the Plan's expert testimony. We therefore affirm the district court's grant of summary judgment to Alerus.

*Pioneer Centres Holding, et al., v. v. Alerus Financial, N.A.,* No. 15-1227
**BACHARACH**, J., dissenting.

This case involves a proposal to transfer control of three dealerships that sold Land Rover vehicles. The dealerships were owned by a company called "Pioneer Centres Holding Company." Pioneer was owned by Mr. Matthew Brewer.



Mr. Brewer wanted to sell his entire interest in Pioneer to its employee stock ownership plan.



The sale was to be negotiated with an independent fiduciary for the plan (Alerus), but the transfer of the dealerships was conditioned on approval of the company that manufactured the vehicles (Land Rover).

Alerus and Mr. Brewer reached an impasse, so the proposed transfer was never submitted to Land Rover for approval. The plan's trustees and the plan itself later sued Alerus for damages, alleging that Alerus had breached fiduciary duties by impeding the sale.

The district court granted summary judgment to Alerus, holding that the trustees and the plan had not established causation between the alleged breach and the inability to complete the sale. The court reasoned that even if Alerus and Mr. Brewer had reached an agreement, the sale could have proceeded only if Land Rover would have approved the transfer. In the court's view, "there [was] insufficient admissible evidence that such approval would have occurred." *Pioneer Centres Holding Co. Emp. Stock Ownership Plan & Trust v. Alerus Fin., N.A.*, No. 12-cv-02547-RM-MEH, 2015 WL 2065923, at *8 (D. Colo. May 1, 2015) (unpublished). The majority agrees with the district court, but I do not. As a result, I respectfully dissent.

For the sake of argument, I assume that Land Rover did not want to approve the transfer. But this assumption is not dispositive. In light of the testimony and our presumption that individuals follow the law, a reasonable fact-finder could conclude that disapproval would have been

2

objectively unreasonable. With such a conclusion, the fact-finder could also reasonably infer that

- Land Rover would have acquiesced in the transfer or

- a court would ultimately have required approval of the transfer.

Because the sole basis for the district court's decision is flawed, I would reverse and remand for further proceedings.[1]

## I.    Standard of Review

The district court concluded that Alerus was entitled to summary judgment. This conclusion is subject to de novo review. *Koch v. City of Del City*, 660 F.3d 1228, 1237 (10th Cir. 2011). In applying de novo review, we consider the evidence and reasonable inferences in the light most favorable to the trustees and the plan. *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014). Summary judgment would have been appropriate only if Alerus had shown that (1) there were no genuine issues

---

[1]    The trustees and the plan also argue that

- the loss of an opportunity to pursue Land Rover's approval would trigger liability even if Land Rover would not have approved the transfer,

- the district court should have shifted the burden of proof on causation, and

- the district court erred in excluding certain expert testimony.

For the sake of argument, I assume the invalidity of these arguments. Even with that assumption, I would reverse the award of summary judgment.

of material fact and (2) Alerus was entitled to judgment as a matter of law. *Koch*, 660 F.3d at 1238.

## II. The Objective-Reasonableness Requirement

Pioneer owned one Land Rover dealership in California and two Land Rover dealerships in Colorado. The parties agree that the laws of both California and Colorado would preclude Land Rover from unreasonably withholding approval regarding the transfer. *See* Cal. Veh. Code § 11713.3(d)(1) (West 2010) (stating that a manufacturer's "consent [to a transfer] shall not be unreasonably withheld"); *id.* § 11713.3(e) (same); Colo. Rev. Stat. § 12-6-120(1)(i)(III) (2010) ("It shall be unlawful . . . for any manufacturer . . . [t]o refuse to approve, unreasonably, the sale or transfer of the ownership of a dealership . . . .").[2]

### 1. California's Objective-Reasonableness Requirement

California's reasonableness requirement was fleshed out in *In re Van Ness Auto Plaza, Inc.*, 120 B.R. 545 (Bankr. N.D. Cal. 1990). This opinion has been followed by many courts, including the Ninth Circuit Court of Appeals. *See, e.g.*, *In re R.B.B., Inc.*, 211 F.3d 475, 477-80 (9th Cir. 2000); *In re Claremont Acquisition Corp.*, 186 B.R. 977, 984-89 (C.D. Cal. 1995),

---

[2] Negotiations between Mr. Brewer and Alerus broke down in 2010. If the negotiations had not broken down, Land Rover would have made its decision based on state laws existing in 2010. Thus, I apply the state laws as they existed in 2010.

4

*aff'd*, 113 F.3d 1029 (9th Cir. 1997); *Fladeboe v. Am. Isuzu Motors Inc.*, 58 Cal. Rptr. 3d 225, 240-42 (Cal. Ct. App. 2007).

In *Van Ness*, the court discussed the objective test governing the reasonableness of a manufacturer's withholding of approval:

> [W]ithholding consent to assignment of an automobile franchise is reasonable under California Vehicle Code section 11713.3(e) if it is supported by substantial evidence showing that the proposed assignee is materially deficient with respect to one or more appropriate, performance-related criteria. This test is more exacting than whether the manufacturer subjectively made the decision in good faith after considering appropriate criteria. It is an objective test that requires that the decision be supported by evidence. The test is less exacting than one which requires that the manufacturer demonstrate by a preponderance of the evidence that the proposed assignee is deficient.

120 B.R. at 549; *see also id.* at 547 ("[W]ithholding consent to assignment is reasonable only if it is based on factors closely related to the proposed assignee's likelihood of successful performance under the franchise agreement.").

The *Van Ness* court identified eight factors that manufacturers may consider in assessing objective reasonableness:

> (1) whether the proposed dealer has adequate working capital; (2) the extent of prior experience of the proposed dealer; (3) whether the proposed dealer has been profitable in the past; (4) the location of the proposed dealer; (5) the prior sales performance of the proposed dealer; (6) the business acumen of the proposed dealer; (7) the suitability of combining the franchise in question with other franchises at the same location; and (8) whether the proposed dealer provides the manufacturer sufficient information regarding [the proposed dealer's] qualifications.

5

*Id.* at 547. The parties agree that these factors would bear on the reasonableness of Land Rover's decision to withhold approval.

In *Van Ness*, the court discussed not only these factors but also the proposed dealer's customer-satisfaction rankings. *See id.* at 550 ("It is not beyond the realm of reasonable decisions for a manufacturer of luxury cars to refuse to accept a dealer with [customer-satisfaction] rankings that are average at best and possibly well-below average."). It is unclear whether the court considered a proposed dealer's customer-satisfaction rankings as an independent factor or part of another factor. *See id.* But either way, *Van Ness* indicates that manufacturers may consider a proposed dealer's customer-satisfaction rankings. *See id.* Thus, for the sake of argument, I assume that manufacturers may consider a proposed dealer's customer-satisfaction rankings as an independent ninth factor.

One state court in California has held that there is another factor that manufacturers may consider: the proposed "dealer's honesty and good faith in its relations with the manufacturer." *Fladeboe v. Am. Isuzu Motors Inc.*, 58 Cal. Rptr. 3d 225, 241 (Cal. Ct. App. 2007). For the sake of argument, I also assume a need to consider this factor.

### 2. Colorado's Objective-Reasonableness Requirement

Courts have not fleshed out Colorado's reasonableness requirement as fully as California's reasonableness requirement. But one federal

6

district court has indicated that Colorado's reasonableness requirement involves "an objective standard." *Arapahoe Motors, Inc. v. Gen. Motors Corp.*, No. 99 N 1985, 2001 WL 36400171, at *9 n.9 (D. Colo. Mar. 28, 2001) (unpublished). I agree for two reasons.

First, an objective-reasonableness requirement would better advance an underlying purpose of Colo. Rev. Stat. § 12-6-120(1): to protect dealers from manufacturers' weighty bargaining power. *See S.J. Glauser DCJB, L.L.C. v. Porsche Cars N. Am., Inc.*, No. 05-cv-01493-PSF-CBS, 2006 WL 1816458, at *5 (D. Colo. June 30, 2006) (unpublished); *Empire Datsun, Inc., v. Nissan Motor Corp. in U.S.A.*, No. 82-M-1027, 1984 U.S. DIST. LEXIS 18092, at *8 (D. Colo. Mar. 29, 1984) (unpublished).

Second, courts have generally treated other jurisdictions' reasonableness requirements as objective rather than subjective. *See, e.g.*, *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 923 F. Supp. 2d 745, 761 (D. Md. 2013) ("[T]he Court finds that [the statute at issue] requires that the rejection of a prospective transfer be grounded on a reasonable, business-related concern regarding the [proposed dealer's] ability to effectively operate the [dealership]. An unfounded . . . refusal is violative of the statute."); *Van Ness*, 120 B.R. at 549 ("This test [of reasonableness] is . . . . an objective test that requires that the [manufacturer's] decision be supported by evidence."); *VW Credit, Inc. v. Coast Auto. Grp.*, 787 A.2d 951, 958 (N.J. Super. Ct. App. Div. 2002) ("The standard of review to

7

determine the reasonableness of withholding consent to transfer of a [dealership] is an objective test that requires that the decision be supported by substantial evidence showing that the proposed [dealer] is materially deficient." (citing *Van Ness*, 120 B.R. at 549)).

For these two reasons, I would conclude that Colorado's reasonableness requirement is objective. Thus, I would conclude that under Colorado law, withholding approval of a transfer "is reasonable only if it is based on factors closely related to the proposed [dealer's] likelihood of successful performance under the franchise agreement." *Van Ness*, 120 B.R. at 547.

### 3. Three More Objective Factors that Land Rover Considers in Determining Whether to Approve a Transfer

Land Rover considers a variety of objective factors when determining whether to approve a transfer. With three exceptions, these objective factors are included in the ten objective factors discussed above. *See* Part II(1), above. The three exceptions are

1.   the purchaser's overall financial strength,

2.   the transfer's likely effect on financial performance, and

3.   the management's commitment to the dealership.

For the sake of argument, I assume that these three objective factors may be considered under the objective-reasonableness requirements of

8

California and Colorado. With these three factors, there are thirteen independent objective factors.

But consideration of objective reasonableness would not encompass Land Rover's actual resistance to the transfer, even if that resistance was in good faith, because subjective factors generally do not belong in an objective test. *See, e.g.*, *United States v. Torres-Castro*, 470 F.3d 992, 1000 (10th Cir. 2006) ("Even if the officers were actually motivated to question [the defendant] about the gun because they discovered shells during the protective sweep, their subjective motivations are irrelevant because the Fourth Amendment turns on the objective reasonableness of the circumstances."); *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 805 (10th Cir. 2007) ("In evaluating whether the employee's working conditions would cause [a reasonable person in the employee's position to feel compelled to resign], 'we apply an objective test under which neither the employee's subjective views of the situation, nor her employer's subjective intent . . . are relevant.'" (quoting *Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1270 (10th Cir. 2004) (alteration in original))); *People v. Cowart*, 244 P.3d 1199, 1203 (Colo. 2010) (en banc) (holding that "[t]he court may not . . . consider subjective factors in making a custody determination" since "'the custody test is objective in nature'" (quoting *People v. Hankins*, 201 P.3d 1215, 1219 (Colo. 2009) (en banc))).

9

**4. Alerus's Argument Regarding the Suitability of an Employee Stock Ownership Plan as a Dealer**

Alerus apparently argues that Land Rover could consider an additional factor: whether the proposed dealer is owned by its employees through an employee stock ownership plan. Alerus's argument entails four steps:

1. Under a company's employee stock ownership plan, ownership lies with the employees.

2. Some employees might be unsuitable owners.

3. Making these employees owners could negatively affect the company's performance.

4. Therefore, a manufacturer may reasonably disfavor proposed dealers that are controlled by employee stock ownership plans.

This argument would not support an award of summary judgment to Alerus.

Under the objective-reasonableness tests in California and Colorado, withholding approval of a transfer is "reasonable only if it is based on factors closely related to the proposed [dealer's] likelihood of successful performance under the franchise agreement." *Van Ness*, 120 B.R. at 547; *see* Part II(1)-(2), above. The resulting question here is whether employee ownership negatively affects the dealer's likelihood of successful performance.

To answer this question, we examine the summary-judgment evidence. This evidence included the report of Dr. Susan Mangiero, who attested to the advantages of ownership by employee stock ownership

10

plans. Alerus did not counter with any evidence suggesting that employee ownership negatively affects performance. In light of Dr. Mangiero's report and the absence of any conflicting evidence, the district court could not award summary judgment to Alerus based on Land Rover's reluctance to approve the transfer to an employee stock ownership plan.[3]

**5.      The Factual Nature of Reasonableness**

As Alerus concedes, reasonableness entails a question of fact. This concession accords with California law, which expressly provides that reasonableness is a question of fact. *See* Cal. Veh. Code § 11713.3(d)(3) (West 2010) ("[W]hether the withholding of consent was unreasonable is a question of fact requiring consideration of all the existing circumstances.").

Alerus nevertheless argues that this issue is routinely resolved on summary judgment. In support of this argument, Alerus cites two non-precedential opinions. These opinions do not support summary judgment here.

The first is *DeSantis v. General Motors Corp.*, an unpublished, one-page memorandum opinion from the Ninth Circuit Court of Appeals. 279 F.

---

[3]      Land Rover did not have Dr. Mangiero's report. But the report provides evidence of the objective advantages of ownership in an employee stock ownership plan. Land Rover may have viewed such ownership with skepticism. But the fact-finder could have regarded such skepticism as objectively unreasonable in light of Dr. Mangiero's report.

11

App'x 435 (9th Cir. 2008). There the plaintiffs applied to a manufacturer to obtain ownership of a car dealership. The manufacturer rejected the application. On summary judgment, the district court ruled in favor of the manufacturer. The Ninth Circuit affirmed, holding that the manufacturer's rejection was objectively reasonable because

> there was substantial evidence of poor customer satisfaction scores during the time period when [one plaintiff] took over as general manager of [the dealership]. There was also substantial evidence of inadequate capitalization because, it is undisputed that when the application was turned down, [this plaintiff] did not meet the requirement that he personally invest unencumbered funds equal to 15 percent of the total dealership capital.

*Id.* at 436.

The second is *Pacesetter Motors, Inc. v. Nissan Motor Corp. in U.S.A.*, a district court opinion by the Western District of New York. 913 F. Supp. 174 (W.D.N.Y. 1996). There a manufacturer (Nissan) withheld approval regarding the transfer of a Nissan dealership. Nissan's stated reason for withholding approval was the proximity of the proposed dealer to an existing Nissan dealership. *Id.* at 177, 179. The transferors sued, asserting that the stated reason had constituted a mere pretext. According to the transferors, Nissan actually withheld approval because of anger with the transferors. *Id.* at 176-80. On summary judgment, the district court held that withholding approval was reasonable because the transferors had conceded that being too close to another Nissan dealership impeded sales.

12

*Id.* at 179. The court added that the transferors' pretext argument was not persuasive for three reasons:

1. Even after "ample discovery," there was no evidence supporting this argument.

2. If Nissan had a strained relationship with the transferors, "it would make more sense that Nissan would be eager to sever the relationship with them and to deal with" the proposed dealer.

3. "[I]t would make no economic sense for Nissan to refuse to approve a [transfer] that would be in its best financial interest, due to some personal 'frustration' with" the transferors.

*Id.* at 179-80.

These two non-precedential opinions do not support summary judgment here. They suggest only that reasonableness may be decided on summary judgment in two extreme circumstances:

1. A dispositive factual issue is undisputed.

2. The non-moving party takes a factual position that is illogical or not reasonably supported by any evidence.

These sorts of extreme circumstances are not present here. Thus, the two non-precedential opinions do not support summary judgment on the issue of objective reasonableness.

## III. A genuine issue of material fact exists on whether Land Rover would have exercised a right of first refusal.

Alerus implies that Land Rover could have exercised a right of first refusal, purchasing Pioneer's dealerships even if withholding approval for the transfer would have been objectively unreasonable. The trustees and

13

the plan seem to question whether Land Rover would have been able to exercise this right.

For the sake of argument, I assume that Land Rover could have exercised the right of first refusal even if withholding approval for the transfer would have been objectively unreasonable. Even with this assumption, a reasonable fact-finder would have had three reasons to doubt whether Land Rover would have exercised the right of first refusal.

First, the summary-judgment evidence indicates that Land Rover, like other manufacturers, exercised this right only rarely.

Second, Land Rover could exercise the right of first refusal only by buying all of Pioneer's dealerships, not simply the Land Rover dealerships. A fact-finder could doubt whether Land Rover would have been willing to buy dealerships that sold competing brands of vehicles.

Third, Land Rover would ultimately have had to divest itself of the dealerships. *See* Cal. Veh. Code § 11713.3(o)(2)(A) (West 2010); Colo. Rev. Stat. § 12-6-120.5(2)(a)(I) (2010).

For these three reasons, a fact-finder could reasonably conclude that Land Rover probably would not have exercised the right of first refusal.

**IV.** **A Land Rover executive testified that Land Rover follows the objective-reasonableness requirements, and our court must presume that Land Rover would have followed these requirements.**

If Land Rover had declined to exercise the right of first refusal, Land Rover would have had to decide whether to approve the transfer. A reasonable fact-finder could conclude that Land Rover would ultimately have based this decision on what was objectively reasonable.

A Land Rover executive testified that Land Rover follows the statutory requirements of objective reasonableness. Even without this testimony, our court would need to presume Land Rover's compliance with the legal requirements of California and Colorado. *See, e.g.*, *Royal Coll. Shop, Inc. v. N. Ins. Co. of N.Y.*, 895 F.2d 670, 682-83 (10th Cir. 1990) (discussing the presumption that a person obeys the law); *NLRB v. Shawnee Indus., Inc.*, 333 F.2d 221, 225 (10th Cir. 1964) ("It is presumed that a person obeys the law and discharges the obligations imposed on him by law.").

In light of these legal requirements, Land Rover's actual concerns about the transfer are not dispositive; what ultimately matters is whether it would have been objectively reasonable for Land Rover to withhold approval. If withholding approval would have been objectively unreasonable, a fact-finder could justifiably predict that Land Rover would have approved the transfer.

15

The reasonableness of a refusal is a factual issue. *See* Part II(5), above. In extreme circumstances where dispositive facts are undisputed or indisputable, this issue may be decided on summary judgment. *See id.* But these kinds of extreme circumstances are not present here.

Viewing the evidence and reasonable inferences favorably to the trustees and the plan, as required,[4] a fact-finder could justifiably conclude that (1) withholding approval would have been objectively unreasonable and (2) Land Rover would have acquiesced in the transfer because doing otherwise would have been objectively unreasonable. The justifiable nature of these conclusions required denial of Alerus's summary-judgment motion.

## V.   If withholding approval would have been objectively unreasonable, the fact-finder could justifiably infer that Land Rover would have been forced to approve the transfer through an injunction.

The trustees and the plan contend that if Land Rover had withheld approval, Pioneer, the trustees, and the plan would have sued for an injunction to force Land Rover to approve the transfer. Alerus does not dispute this point or argue that injunctive relief would have been unavailable.

Nonetheless, the majority concludes that the trustees and the plan failed to present this contention in district court. For the sake of argument,

---

[4]    *See* Part I, above.

16

let's assume that the majority is correct; if it is, the omission in district court would not matter because Alerus has never questioned preservation of this contention.

Alerus elsewhere pointed out where it thought the trustees and the plan were making a new argument on appeal. Appellee's Resp. Br. at 29, 38, 55; Oral Arg. at 24:24-24:46. And, Alerus specifically argued that the trustees and the plan had forfeited one of their appeal points (shifting the burden of proof) by failing to present that point in district court. Appellee's Resp. Br. at 29. But Alerus does not suggest that the trustees or the plan failed to argue in district court that they would have sued Land Rover to force its approval of the transfer.

Instead, Alerus responds on the merits, acknowledging that the trustees and the plan could prevail if a suit would probably have compelled Land Rover to approve the transfer. *See id.* at 53. Thus, Alerus has forfeited any contention that it might have had on preservation of the issue. *See Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1138-39 (10th Cir. 2010) (concluding that the plaintiffs forfeited any argument that they might have had on nonpreservation of an issue).[5] In these circumstances, I would address the issue on the merits, just as Alerus has done.

---

[5] The majority adds that in district court "neither party . . . moved to admit evidence on whether a lawsuit between Pioneer and Land Rover was probable or likely to succeed." Maj. Op. at 30. But the summary-judgment

17

On the merits, I regard the evidence as sufficient to create a genuine issue of material fact. Land Rover might not have wanted to approve the transfer. But if Land Rover had refused, the trustees and the plan could have sued. They would likely have prevailed if the fact-finder regarded Land Rover's refusal as objectively unreasonable.

The majority appears to misunderstand my view on the relevance of a potential suit against Land Rover. For example, the majority suggests that I believe that Pioneer has a valid claim against Land Rover under state law. Maj. Op. at 29. I don't think so, for Pioneer certainly doesn't have a valid claim against Land Rover; Alerus never agreed to the purchase on behalf of the plan, so Land Rover never had to decide whether to approve the transfer. Thus, Land Rover is not to blame for the deal collapsing.

The reasonableness of Land Rover's possible refusal is pertinent only because of what Alerus has argued. Alerus argues that if it had breached a fiduciary duty, this breach would not have caused any damage because Land Rover would have refused to approve the transfer. In assessing

---

record indicates that Pioneer, the trustees, and the plan would have sued if Land Rover had withheld approval of the transfer. *See* Appellants' App'x, vol. XI at 2227 ("Obviously, if [Land Rover's] approval of the proposed transaction is not received, Pioneer and Mr. Brewer will have no choice but to seek appropriate administrative or judicial relief . . . ."). In addition, the summary-judgment record contains extensive evidence bearing on whether the lawsuit would have succeeded. *See* Part VI, below (examining this evidence and viewing it in the light most favorable to the trustees and the plan).

18

Alerus's argument, this court must consider whether the trustees and the plan could have obtained a court decree forcing Land Rover to approve the transfer.

In addition, the majority contends that the outcome of a suit against Land Rover would not affect whether Alerus had prevented the sale from taking place. But according to the trustees and the plan, the transaction fell apart because of Alerus's breach of fiduciary duty. Absent that breach, according to the trustees and the plan, Land Rover would ultimately have approved the transfer (either voluntarily or through an injunction).

Viewing the evidence in the light most favorable to the trustees and the plan, a fact-finder could justifiably conclude that Land Rover would probably have approved the transfer. If Land Rover would have done so, Alerus's alleged breach would indeed have been the cause of the plaintiffs' damages.

## VI. Viewing the evidence favorably to the trustees and the plan, the fact-finder could justifiably infer that disapproval of the transfer would have been objectively unreasonable.

As discussed above, thirteen factors bear on the objective reasonableness of Land Rover's decision whether to approve the transfer. *See* Part II(1)-(3), above. Applying the thirteen factors, the fact-finder could justifiably conclude that withholding approval would have been objectively unreasonable.

19

1. **Whether the Proposed Dealer Has Adequate Working Capital**

Under *Van Ness*, the first objective factor is whether the proposed dealer has adequate working capital. 120 B.R. at 547. This factor could reasonably support approval.

It is undisputed that during the negotiations with Alerus, Pioneer's working capital exceeded Land Rover's guidelines by over 200 percent. Alerus does not allege that this working capital would somehow disappear when Pioneer became employee-owned. Thus, a reasonable fact-finder could conclude that the plan had ample working capital.

2. **The Extent of the Proposed Dealer's Experience**

The second objective factor is the extent of the proposed dealer's experience. *Van Ness*, 120 B.R. at 547. It is undisputed that

- Pioneer's senior management was experienced,

- senior management planned to remain with Pioneer after the sale, and

- Pioneer's other employees were generally experienced.

Based on these facts, one could justifiably regard Pioneer's senior management and other employees as highly experienced. Thus, the fact-finder could justifiably conclude that the proposed dealer (the plan) had substantial experience.

Aside from Mr. Brewer, Pioneer's senior management consisted of eight employees. These employees had over 115 years of combined

experience with Pioneer. Most had been with Pioneer since 1992, when Pioneer opened Colorado's first stand-alone Land Rover dealership. Some employees had been with Pioneer even longer. During their service, Pioneer grew into a successful, multimillion-dollar enterprise.

Members of senior management expressed their intentions to remain with Pioneer after the sale and would have entered into long-term employment contracts. And at least some senior managers planned to enter into long-term employment contracts with non-compete provisions.

Many of Pioneer's other employees were also experienced. In 2010, the average employee had been with Pioneer for 5.35 years. This average included some employees who had been hired in 2008.

A reasonable fact-finder could regard the plan's personnel as highly experienced in operating the dealerships.

### 3. Whether the Proposed Dealer Has Been Profitable in the Past

The third objective factor is whether the proposed dealer has been profitable in the past. *Van Ness*, 120 B.R. at 547. On this factor, a reasonable fact-finder could conclude that Pioneer had historically been profitable. After Pioneer became employee-owned, the same management team and other employees would have remained with Pioneer. Thus, a reasonable fact-finder could conclude that this factor would have supported approval.

21

Alerus apparently suggests that in 2009 some of Pioneer's dealerships were unprofitable. But this alleged fact is disputed by other evidence. At summary judgment, the district court had to view the evidence favorably to the trustees and the plan. *See* Part I, above. With that viewpoint, a reasonable fact-finder could justifiably regard Pioneer as profitable in 2009.

**4.      The Location of the Proposed Dealer**

The fourth objective factor is the location of the proposed dealer. *Van Ness*, 120 B.R. at 547. The trustees and the plan contend that Pioneer's dealerships had prime locations. Alerus does not disagree with this contention, and the dealership locations would not have changed with Pioneer's transition to employee ownership. As a result, this factor weighs against summary judgment for Alerus.

**5.      The Proposed Dealer's Prior Sales Performance**

The fifth objective factor is the proposed dealer's prior sales performance. *Van Ness*, 120 B.R. at 547. As mentioned above, the trustees and the plan presented evidence indicating that Pioneer's dealerships had been profitable. *See* Part VI(3), above. This evidence would allow a reasonable fact-finder to conclude that Pioneer's past sales had been strong. After Pioneer became employee-owned, the same senior managers and employees would continue to work for Pioneer. Therefore, a reasonable

22

fact-finder could conclude that past sales performance would have supported approval.

Alerus points to a brief period when sales at Pioneer's Land Rover dealerships dipped below the national average. The trustees and the plan present evidence attributing the dip largely to fire damage at one of the dealerships.

A reasonable fact-finder could regard the temporary sales dip as immaterial, for Pioneer was only marginally below the national average and only for a short time. By the time that Land Rover would have made its approval decision, sales had rebounded.

In light of the historically strong sales, the fact-finder could reasonably weigh this factor against an award of summary judgment to Alerus.

### 6.    The Proposed Dealer's Business Acumen

The sixth objective factor is the proposed dealer's business acumen. *Van Ness*, 120 B.R. at 547. The trustees and the plan presented evidence allowing the fact-finder to conclude that Pioneer's senior management had sound business acumen. These senior managers planned to remain with Pioneer after it became employee-owned. Therefore, a reasonable fact-finder could conclude that the plan had sound business acumen.

According to Alerus, Land Rover could reasonably question the plan's business acumen because no one could guarantee whether or how

23

long these senior managers would remain with Pioneer. The fact-finder could reasonably downplay this concern, for the senior managers planned to enter into long-term employment contracts, some with non-compete provisions.

Alerus also appears to question the business acumen of companies owned by an employee stock ownership plan. Essentially, Alerus suggests that Land Rover could discriminate against these companies, for some employees may be unsuited to ownership. But some of the evidence indicates that employee-owned companies outperform their competitors. *See* Part II(4), above. Thus, the fact-finder could reasonably question why Land Rover would doubt the business acumen of dealers controlled by employee stock ownership plans.

The fact-finder could reasonably conclude that the proposed dealer had sound business acumen. Thus, this factor cuts against summary judgment to Alerus.

### 7.     The Suitability of Combining the Franchise in Question with Other Franchises at the Same Location

The seventh factor is the suitability of combining the franchise in question with other franchises at the same location. *Van Ness*, 120 B.R. at 547. This factor is pertinent here because Pioneer had Porsche and Audi dealerships at the same location as one Land Rover dealership. According to the trustees and the plan, these other dealerships complemented the Land

24

Rover dealership. Alerus does not dispute this point, and the arrangement would not have changed with Pioneer's transition to employee ownership. As a result, this factor could reasonably support approval of the transfer.

### 8. Whether the Proposed Dealer Provided the Manufacturer with Sufficient Information Regarding Qualifications

The eighth factor is whether the proposed dealer provided the manufacturer with sufficient information regarding qualifications. *Van Ness*, 120 B.R. at 547. The parties do not make any arguments about this factor.

The record allows a reasonable inference that Land Rover had extensive information about Pioneer. Consequently, this factor weighs against summary judgment for Alerus.

### 9. The Proposed Dealer's Customer-Satisfaction Rankings

The *Van Ness* court appeared to recognize a ninth factor that manufacturers may consider: the proposed dealer's customer-satisfaction rankings. *See* 120 B.R. at 550. Based on the summary-judgment evidence, a reasonable fact-finder could conclude that Pioneer's customer-satisfaction rankings were above average. Nothing in the record suggests that customer satisfaction would drop with Pioneer's transition to employee ownership.

Alerus points to a brief period when Pioneer's customer-satisfaction rankings were not above average. In December 2009, one metric showed

that Pioneer's Land Rover dealerships were slightly below the national average. By another metric, these dealerships were at the national average.

The fact-finder could reasonably view these rankings as an aberration caused largely by damage from a fire in October 2009. In addition, by the time that Land Rover would have made its decision, customer-satisfaction rankings had recovered. As a result, this factor weighs against summary judgment to Alerus.

### 10. The Proposed Dealer's Honesty and Good Faith Dealings with the Manufacturer

For the sake of argument, I assume that there is a tenth factor that manufacturers may consider: the proposed dealer's honesty and good faith dealings with the manufacturer. *See Fladeboe v. Am. Isuzu Motors Inc.*, 58 Cal. Rptr. 3d 225, 241 (Cal. Ct. App. 2007); Part II(1), above. This factor could not justify summary judgment to Alerus.

Alerus provides two reasons for Land Rover to view Pioneer as dishonest. First, Alerus contends that in the years preceding the negotiations, Mr. Brewer had sold about one-third of his Pioneer shares to the plan without Land Rover's approval. The parties agree that the sales occurred, but they dispute whether the sales required Land Rover's approval. Second, Alerus alleges that Mr. Brewer falsely represented ownership of 100% of Pioneer's shares even after some of the Pioneer shares had been sold to the plan. For the sake of argument, I assume that

26

the sales required Land Rover's approval and that Mr. Brewer falsely represented his ownership of Pioneer's shares. Even with these assumptions, a genuine question of material fact would exist on the reasonableness of Land Rover's potential decision to nix the transfer.

Alerus's first argument fails because a reasonable fact-finder could conclude that Mr. Brewer had made an honest mistake in failing to seek Land Rover's advance approval. Alerus's argument that the sales required approval is based on Land Rover's dealership agreements. Only one of these agreements exists in the summary-judgment record: an agreement between a Pioneer subsidiary and Land Rover.

In part, the agreement restricted sales of shares of 15% or greater equity in the "Dealer." The agreement identified the "Dealer" as "Land Rover Miramar, Inc. d/b/a Land Rover Miramar." Appellants' App'x, vol. V, at 808. In addition, the agreement arguably restricted sales of Pioneer's equity by catch-all language preventing Mr. Brewer from making any change "in the foregoing in any respect without [Land Rover's] prior written approval." *Id.* at 813. This provision restricted transfers of entities listed to that point, but Pioneer's ownership was set out on the next page.

For the sake of argument, I assume that one or both of the provisions required advance approval of the changes in Pioneer's ownership. But the need for approval is not clear. Thus, a reasonable fact-finder could conclude that Mr. Brewer had made an honest mistake in failing to seek

27

Land Rover's advance approval. Because there was little summary-judgment evidence to suggest that Mr. Brewer had intentionally breached the agreement, a reasonable fact-finder could justifiably conclude that it would be objectively unreasonable for Land Rover to withhold approval based on a belief that Mr. Brewer had flouted the agreement.

Alerus's second argument is that Mr. Brewer falsely represented that he owned 100% of Pioneer's shares. This representation appears in a single exhibit attached to one of the dealership agreements. By the time that this agreement was signed, Mr. Brewer had sold 14.5% of Pioneer's shares to the plan. But the fact-finder could reasonably conclude that the erroneous statement of ownership would not have benefited Mr. Brewer or harmed Land Rover.

But let's suppose that the fact-finder regards Mr. Brewer as dishonest based on his failure to obtain advance approval for past sales or his statement that he owned 100% of Pioneer's shares rather than 85.5%. If the transfer were approved, the sale would have stripped Mr. Brewer of any ownership interest in Pioneer. If Land Rover thought that Mr. Brewer had acted deceptively, Land Rover presumably would have relished the transfer's diminution in Mr. Brewer's control over the dealerships.[6]

---

[6]    As controlling shareholder of Pioneer, Mr. Brewer exercised complete control over the dealerships. By contrast, Mr. Brewer was one of three trustees for the plan. Thus, if the sale and transfer had taken place,

28

At oral argument, Alerus contended that a fact-finder could reasonably suspect complicity of the other trustees and the plan in Mr. Brewer's alleged misdeeds. Oral Arg. at 26:54-28:10. But, the converse is also true: the fact-finder could reasonably conclude that the other trustees and the plan

- did not know that the transfers required authorization by Land Rover and

- did not know that Mr. Brewer had incorrectly stated his ownership percentage in Pioneer.

If the fact-finder drew these conclusions, the fact-finder could reason that Land Rover should have relished the opportunity to deal with two of the innocent trustees and the plan rather than an individual who had acted deceptively.[7] *See Pacesetter Motors, Inc. v. Nissan Motor Corp. in U.S.A.*, 913 F. Supp. 174, 180 (W.D.N.Y. 1996); *see also* Part II(5) (discussing *Pacesetter Motors*).

But let's suppose that the fact-finder regards the other trustees and the plan as complicit in Mr. Brewer's alleged dishonesty. Even then, the

---

Mr. Brewer would have gone from total control to a minority vote as one of three trustees.

[7] The majority points to evidence indicating that Land Rover believed "that the Plan was complicit in [Mr. Brewer's] deception." Maj. Op. at 27 n.11. Let's assume that the majority is right. Even if Land Rover faulted the plan, the fact-finder could have regarded that belief as objectively unreasonable for the reasons discussed in the text.

fact-finder could reasonably conclude that any dishonesty by the trustees and the plan would not justify rejection of the transfer. Federal and state courts have long recognized gradations of dishonesty. For instance, federal and state courts have done so in cases involving

- securities law,[8]

- agency law,[9]

- punitive damages,[10]

---

[8] *See, e.g.*, *McKeel v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 419 F.2d 1291, 1292 (10th Cir. 1969) (upholding the district court's finding that "in the main [the plaintiff's] testimony is found to be *completely* false" (internal quotation marks omitted) (emphasis added)).

[9] *See, e.g.*, *Westinghouse Credit Corp. v. Green*, 384 F.2d 298, 300 (10th Cir. 1967) ("[The defendant] had never investigated either the property or the process, and the representations that it had done so were *completely* false." (emphasis added)).

[10] *See, e.g.*, *Thomas v. Metro. Life Ins. Co.*, 40 F.3d 505, 510 (1st Cir. 1994) (holding that the plaintiff "simply has not shown that [the defendant's] conduct in the instant case rises to the level of morally reprehensible conduct or *extraordinary* dishonesty" necessary for punitive damages under New York law (emphasis added)).

- the administration of estates,[11]

- the Federal Rules of Evidence,[12]

- misconduct by attorneys,[13] and

- misconduct by law enforcement officers.[14]

---

[11] *See, e.g.*, *Fourniquet v. Perkins*, 48 U.S. 160, 171 (1849) (stating that a petition "alleged, not merely acts of maladministration, but instances of dishonesty and spoliation *extraordinary in character and extent*" (emphasis added)).

[12] *See, e.g.*, *United States v. Morgan*, 505 F.3d 332, 340 (5th Cir. 2007) (holding that the defendant's "violations of the conditions of her pretrial release rise to a *level* of dishonest conduct sufficient to allow the government's inquiry" on cross-examination about specific instances of misconduct (emphasis added)).

[13] *See, e.g.*, *Read v. State Bar*, 807 P.2d 1047, 1062 (Cal. 1991) ("[P]etitioner's *high degree* of dishonesty warrants disbarment." (emphasis added)).

[14] *See, e.g.*, *Doe v. Dep't of Justice*, 565 F.3d 1375, 1380 (Fed. Cir. 2009) (criticizing a disciplinary board for failing "to articulate a meaningful standard as to when private dishonesty [by an FBI agent] rises to the *level* of misconduct that adversely affects the 'efficiency of the service'" (emphasis added) (quoting 5 U.S.C. § 7513(a) (2006))); *State v. Pub. Safety Emps. Ass'n*, 323 P.3d 670, 690 (Alaska 2014) (noting that "there are *gradations* of dishonesty that public policy will tolerate in its police officers" (emphasis added)); *Town of Stratford v. AFSCME, Local 407*, 105 A.3d 148, 154 (Conn. 2014) ("[W]e must consider whether [a police officer's] dishonesty was '*so egregious* that it requires nothing less than the termination of [his] employment so as not to violate public policy . . . .'" (emphasis added) (third alteration in original) (quoting *State v. AFSCME, Local 391*, 69 A.3d 927, 938 (Conn. 2013))); *Kitsap Cty. Deputy Sheriff's Guild v. Kitsap County*, 219 P.3d 675, 680 (Wash. 2009) ("[E]ven if *Brady* [*v. Maryland*, 373 U.S. 83 (1963)] case law constituted a public policy against reinstatement of [a police] officer found to be dishonest, it provides no guidance regarding what *level* of dishonesty would prohibit reinstatement." (emphasis added)).

31

Applying similar gradations here, the fact-finder could reasonably conclude that even if the other trustees and the plan had been complicit in Mr. Brewer's missteps, Land Rover should have regarded this complicity as an inadequate reason to withhold approval of the plan.

Alerus argues that Land Rover could reasonably withhold approval if the plan was materially deficient under just one factor. That is theoretically true. For example, if Pioneer's senior managers had cheated Land Rover, embezzled, or committed serious crimes, no one could legitimately fault Land Rover for withholding approval regardless of other positive factors.

This is the point of a California opinion invoked by Alerus: *Fladeboe v. American Isuzu Motors, Inc.*, 58 Cal. Rptr. 3d 225 (Cal. Ct. App. 2007). There a car manufacturer refused to approve the transfer of a dealership, and the trial court impliedly found as a factual matter that this decision was objectively reasonable. *Fladeboe*, 58 Cal. Rptr. 3d at 229-30, 240. But that case differed from ours in the applicable standard of review and in the degree of culpability on the part of the existing dealer.

First, the standard of review was different. Here we are considering an award of summary judgment to Alerus. Thus, we view all of the evidence and reasonable inferences in the light most favorable to the trustees and the plan. *See* Part I, above. By contrast, the trial court in *Fladeboe* conducted a bench trial and impliedly found that the car

32

manufacturer (Isuzu) had reasonably withheld approval of the transfer. *Id.* at 237-40. Thus, the California Court of Appeal applied the substantial-evidence standard. *Id.* at 238-39. Under this standard, the appellate court "consider[s] the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings." *Thompson v. Asimos*, 212 Cal. Rptr. 3d 158, 169 (Cal. Ct. App. 2016). In *Fladeboe*, the defendant manufacturer was the prevailing party and beneficiary of this generous standard.

Second, the facts were far more egregious in *Fladeboe*. There a jury found that Mr. Ray Fladeboe and a corporation that he owned had committed fraud, and the California Court of Appeal upheld that finding. *Fladeboe*, 58 Cal. Rptr. 3d at 233, 242-44. This fraud stemmed from Mr. Fladeboe's scheme to avoid taxes. *Id.* at 230. As part of that scheme, Mr. Fladeboe had his corporation transfer the dealership's assets to a new corporation, which he also owned. *Id.* at 230-32. He then dissolved the old corporation and allowed the new corporation to service Isuzu vehicles without the appropriate license, assigned the original corporation's Isuzu code number to the new corporation, allowed the new corporation to collect over $214,000 in sales incentives from Isuzu, and collected over $171,000 in warranty reimbursements from Isuzu—all without the knowledge of Isuzu. *Id.* at 232-33, 236. Isuzu learned of the dissolution eight months after the fact and discovered that the new corporation had

33

serviced Isuzu vehicles without a license and had secretly used the old dealer's code number to collect sales incentives and warranty reimbursements that Isuzu had intended for its old dealer. *Id.* Ultimately, Isuzu refused to accept the new corporation as a dealer. *Id.* at 232.

If the trustees and the plan had concocted a scheme like the one in *Fladeboe*, few would question Land Rover's right to withhold approval. And even with our far more benign facts, a fact-finder could justifiably conclude that Land Rover might have reasonably withheld approval. But a reasonable fact-finder could also have regarded it as objectively unreasonable for Land Rover to nix the transfer. Unlike the dealer in *Fladeboe*, the trustees and the plan had not

- concocted a tax-avoidance scheme,

- secretly dissolved,

- secretly assigned a dealer code number, or

- secretly allowed a new dealer to operate without a license, collect funds from the manufacturer, and service vehicles.

*Fladeboe* suggests only an obvious truism: A fact-finder can justifiably find that a vehicle manufacturer may reasonably withhold approval when victimized by a proposed dealer's fraudulent scheme to cheat the manufacturer out of hundreds of thousands of dollars. That truism does not affect our inquiry.

34

**11. The Proposed Dealer's Overall Financial Strength**

A Land Rover executive testified that Land Rover considers the proposed dealer's overall financial strength in deciding whether to approve a transfer. For the sake of argument, I assume that Land Rover could consider this factor. *See* Part II(3), above.

The summary-judgment evidence indicates that Pioneer was financially strong and would remain so after becoming employee-owned. As noted above, Pioneer's working capital exceeded Land Rover's guidelines by over 200 percent. *See* Part VI(1), above. Around that time, Pioneer's total capital was about $16.2 million. In addition, Pioneer owned unencumbered vehicles worth about $11 million. If necessary, Pioneer could use these vehicles to rapidly obtain cash or financing.

Pioneer also owned its real estate, which could serve as an additional source of financing. In November 2009, this real estate was worth about $9.5 million.

With this evidence, a fact-finder could reasonably conclude that Pioneer was financially strong. No evidence suggested that this situation would change once Pioneer became employee-owned. Therefore, this factor weighs against an award of summary judgment to Alerus.

**12. The Transfer's Likely Effect on Financial Performance**

A Land Rover executive testified that in determining whether to approve a transfer, Land Rover considers the likely effect on financial

35

performance. For the sake of argument, I assume that Land Rover may consider this factor. *See* Part II(3), above.

As noted above, senior management planned to remain with Pioneer after the sale. *See* Part VI(2), above. This continuity suggests that financial performance would not be adversely affected by the sale.

Indeed, the summary-judgment evidence indicates that the sale could enhance Pioneer's financial performance. As discussed above, the record contains evidence that ownership by an employee stock ownership plan is advantageous. *See* Part II(4), above. Thus, drawing all reasonable inferences in favor of the trustees and the plan, a reasonable fact-finder could infer that the sale would probably boost Pioneer's financial performance. This factor weighs against an award of summary judgment to Alerus.

**13. Management's Commitment to the Dealership**

In determining whether to approve a transfer, Land Rover also considers the level of commitment shown by the proposed dealer's management. For the sake of argument, I assume that Land Rover may consider this factor. *See* Part II(3), above.

The summary-judgment evidence indicates that

- Pioneer's senior managers planned to enter into long-term employment contracts, at least some of which had non-compete provisions, and

36

- employees generally become more committed when they become owners.

Therefore, a reasonable fact-finder could conclude that (1) senior management was committed to Pioneer and (2) after Pioneer became employee-owned, senior management would remain committed or even intensify their commitment. As a result, the factor weighs against an award of summary judgment.

\* \* \*

In sum, none of the thirteen objective factors precludes a genuine issue of material fact on the reasonableness of a decision by Land Rover to withhold approval. This case is not one where dispositive facts are undisputed or indisputable. As a result, the district court should have concluded that a genuine issue of material fact existed. In these circumstances, I would reverse. Because the majority reaches a different conclusion, I respectfully dissent.

## VII. Conclusion

For the sake of argument, I assume that Land Rover did not want to approve the transfer. Notwithstanding that assumption, a reasonable fact-finder could conclude that Land Rover would ultimately approve the transfer because doing otherwise would have been objectively unreasonable.

37

The record indicates that Land Rover follows the objective-reasonableness requirements of California and Colorado, which would preclude Land Rover from unreasonably withholding approval. Our court must presume that Land Rover would have followed these requirements.

The objective reasonableness of Land Rover's hypothetical refusal entails a disputed question of material fact. In extreme circumstances where dispositive facts are undisputed or indisputable, objective reasonableness may be decided on summary judgment. But those circumstances are not present here.

Viewing the evidence and reasonable inferences in the light most favorable to the trustees and the plan, I conclude that a reasonable fact-finder could find that (1) withholding approval would be objectively unreasonable, (2) Land Rover probably would not have exercised the alleged right of first refusal, and (3) Land Rover would probably have approved the transfer.

Alternatively, the fact-finder could reasonably conclude that Pioneer, the trustees, and the plan would have used an injunction to force Land Rover to approve the transfer. Viewing the evidence and reasonable inferences favorably to the trustees and the plan, as we must at this stage, we should conclude that the state courts would have entered an injunction to require Land Rover's approval of the transfer.

Because the trustees and the plan have defeated the sole basis for the district court's ruling, I would reverse and remand for further proceedings. Because the majority affirms, I respectfully dissent.